# EXHIBIT A

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

MONICA MORRISON,

Plaintiff,

-against-

TELUS DIGITAL, TELUS CORPORATION, JESSICA SARGENT and PEGGY KEYS

Defendants.

Case No.: 159760/2026

**COMPLAINT**

*Jury Trial Demanded*

PLAINTIFF MONICA MORRISON, by her attorneys Goddard Law PLLC, 39 Broadway, Suite 1540, New York, New York, 10006, alleges as follows:

**PRELIMINARY STATEMENT**

1. Plaintiff Monica Morrison ("Plaintiff") is a highly accomplished project management professional who, over the course of nearly two years, consistently exceeded expectations at Defendant TELUS — earning a promotion to Project Manager, receiving the company's prestigious Stella Luminary Award, and building a strong reputation for strategic initiative and cross-functional leadership. Plaintiff was on track for a stellar career at Defendant TELUS.

2. Plaintiff was initially enthralled when Defendant TELUS offered her a new role on a new project – the GenAI Project Manager role. While this would be an intensive and complex role, Defendant TELUS, Plaintiff's new manager, Director Sargent, and her skip-level manager, Cristina Werdall, promised her a full three months of training to ease her into the transition.

3. Shortly after beginning her new role, Plaintiff identified serious and escalating legal and ethical violations within Defendant TELUS's GenAI project, including systematic data

security breaches; the failure to properly pay thousands of workers; and the mass distribution of unpaid assessments to approximately 90,000 workers.

4. Plaintiff quickly noticed that many of these legal and ethical issues arose from Defendant TELUS' flawed "Roster" database, which was used to track the information for thousands of contributors working for Defendant TELUS. The Roster had incorrect contact information, payment information, and faulty instructions regarding permissions and authorizations. Plaintiff immediately reported to Director Sargent that the Roster was rife with missing, outdated, or inaccurate information, resulting in constant security breaches and failure to properly pay contributors.

5. Director Keys and Director Sargent swiftly shut down Plaintiff for complaining about the Roster, claiming bizarrely that Director Sargent has the Roster of thousands of individuals "in her head" and that she knows what she's doing. Director Keys and Director Sargent ordered Plaintiff to simply work on damage control, instead of fixing the flawed database which sparked continued legal and ethical violations.

6. On or around November 7, 2025, Plaintiff reported further potential legal and ethical violations verbally and in writing to her supervisors, Director Sargent, Director Keys, and VP Pike.

7. Rather than investigate or address the violations Plaintiff reported, Defendants launched an immediate and sustained campaign of retaliation against her: immediately ceasing Plaintiff's 90 day training plan after a mere two weeks; fabricating performance deficiencies and blaming Plaintiff for the very issues she blew the whistle on; threatening termination and a reduction in salary; publicly humiliating Plaintiff in a company group chat, isolating her from work communications, and systematically undermining her standing on the team.

8. The severity of Defendants' retaliatory conduct caused Plaintiff to develop serious mental health symptoms, including severe anxiety and panic attacks, ultimately necessitating a medical leave of absence. Plaintiff's Bipolar condition, previously well under control, began to flare up severely.

9. Defendants continued their retaliation even after Plaintiff went on approved FMLA leave and disclosed mental health disabilities, restricting her account access, failing to process her leave applications properly, and creating obstacles to her Washington State Paid Family and Medical Leave eligibility — hardships to which no similarly situated colleague was subjected.

10. This continued retaliatory conduct has only hurt Plaintiff more, and, utterly distraught at and triggered by the prospect of returning to work in May 2026, she was hospitalized for her mental health symptoms in April 2026.

11. In addition, Plaintiff's salary as a Generative AI Project Manager – $140,000 — was significantly below competitive market rates, and, upon information and belief, significantly below her male comparators.

12. Accordingly, Plaintiff brings this action pursuant to the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq.; the Fair Labor Standards Act, 29 U.S.C. § 201 et seq.; the New York Labor Law, including §§ 194, 215, and 740; the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq.; and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq. By this action, Plaintiff seeks compensatory and punitive damages, back pay, reinstatement, attorneys' fees, and all other relief available under applicable federal, state, and local law for Defendants' unlawful conduct.

## PARTIES

13. Plaintiff is a citizen of the United States who currently resides in New York City. Plaintiff is currently employed by Defendant TELUS.

14. Plaintiff was subjected to disability discrimination, failure to accommodate, a hostile work environment, unequal pay, FMLA retaliation, and whistleblower retaliation at Defendant TELUS.

15. Upon information and belief, Defendant TELUS Digital, formerly d/b/a TELUS International (U.S.), was and is a subsidiary of the Canadian-based Telus Corporation and was and is a provider of artificial intelligence ("AI"), customer experience management, data, and digital solutions services registered to operate under the laws of the State of Nevada, with an operating office located at 2251 South Decatur Blvd, Las Vegas, Nevada 89102.

16. Upon information and belief, Defendant Telus Corporation is the Canadian parent company of TELUS Digital. Defendant Telus Corporation maintains headquarters at 510 West Georgia Street, Vancouver, British Columbia, Canada.

17. At all times relevant herein, Plaintiff was Defendant TELUS Digital and Defendant Telus Corporation's (together, "Defendant TELUS") "employee" within the meaning of all relevant Federal, State, and local laws, including, but not limited to, Title VII.

18. At all relevant times herein, Defendant TELUS was Plaintiff's "employer" within the meaning of all Federal, State, and local laws, including, but not limited to, Title VII.

19. Defendant Jessica Sargent ("Director Sargent") was, at all relevant times, Director of Delivery, GenAI. At all relevant times, Director Sargent was Plaintiff's direct supervisor and/or had supervisory authority over Plaintiff and had the ability/authority to affect the terms and conditions of Plaintiff's employment. Director Sargent actually participated in conduct giving rise

to Plaintiff's discrimination, hostile work environment, and retaliation claims. Director Sargent is being sued herein in her individual and official capacities. Upon information and belief, Director Sargent is a resident of Pennsylvania.

20. Defendant Peggy Keys ("Director Keys") was, at all relevant times, Director of Quality, GenAI. Director Keys actually participated in conduct giving rise to Plaintiff's discrimination, hostile work environment, and retaliation claims. Director Keys is being sued herein in her individual and official capacities. Upon information and belief, Director Keys is a resident of Illinois.

## JURISDICTION AND VENUE

21. Jurisdiction of the Court over this controversy is based upon C.P.L.R. §§ 301 and 302, because Defendants are located in New York, and/or are transacting business in New York, New York, and because the majority of events happened in New York, New York.

22. Venue is proper pursuant to CPLR § 503(a)(2) because Defendants are located in New York, New York and a substantial part of the events or omissions that led to the claim occurred in New York, New York.

## FACTUAL ALLEGATIONS

### Plaintiff Has Been Diagnosed with Bipolar I Disorder

23. Since before her employment with Defendant TELUS, Plaintiff has been diagnosed with Bipolar I Disorder as well as Post Traumatic Stress Disorder.

24. Up until the retaliation, discrimination and hostile work environment Plaintiff endured from Defendants, Plaintiff's symptoms were well-managed for years, and she had no issues effectively performing her job duties.

**Plaintiff Begins Working at Defendants and**
**Builds Strong Rapport with Staff and Leadership**

25. On or around November 15, 2023, Defendant TELUS hired Plaintiff to the position of Writer Analyst with a starting wage of $27.00 per hour. Plaintiff worked remotely.

26. In her capacity as Writer Analyst, Plaintiff was responsible for contributing to a special writing project known as "Project Sherlock," which involved formulating AI data solutions for clients of the parent company Defendant TELUS International, including, but not limited to, Google, Meta, Nvidia, and other, smaller agencies.

27. Plaintiff excelled in her position and quickly built positive rapport and strong working relationships with her colleagues and supervisors.

**Defendant TELUS Promotes Plaintiff to a Leadership Position**

28. In or around May 2024, Defendant TELUS promoted Plaintiff to the position of Project Management Team Lead for Project Sherlock in recognition of her accomplishments and acumen.

29. In this higher-level role, Plaintiff managed a team of 17 Writer Analysts and trained a global team of 140 Writers and Researchers based in several countries, including Japan, India, Ireland, and Brazil, with the majority of employees based in the U.S.

30. In her new role, Plaintiff reported directly to Director Marinta Hegarty (hereinafter "Director Hegarty") and Program Manager Mildred Aguilar (hereinafter "Manager Aguilar").

**Plaintiff Continually Excels in More Challenging Roles**

31. In or around October 2024, as part of Project Sherlock, Defendant TELUS launched the AI platform Fuel-iX, an automation solution for enterprises. Plaintiff worked diligently on this platform and created her own chatbot, which she named "Bazlinton". Director Hegarty and Manager Aguilar lauded Plaintiff's work and instructed her to test and deploy Bazlinton.

32. Manager Aguilar instructed Plaintiff to scale and develop the chatbot solution for all members of the global team. Plaintiff spearheaded the project and successfully scaled the solution for an LLM rating project team working for Google.

33. In or around April 2025, Plaintiff was nominated for the Luminary Awards, a company-wide, annual reward allocated by a panel of executive leaders to rising stars at Defendant TELUS. She was selected out of over 3,500 nominees to the award.

34. In or around May 2025, Google canceled the Project Sherlock contract. Defendant TELUS notified Plaintiff and her team that there would be layoffs and that some employees would pivot to pilot a program for the Google Search team.

35. In or around May 2025, Defendant TELUS informed Plaintiff that she would become the Copilot Team Lead on the Google Search project.

36. As Copilot Team Lead, Plaintiff was responsible for building custom chatbot solutions for the Google Search team; scale the chatbot solutions to a larger, global audience of independent contractors; and assist with quality review. One of the custom chatbots Plaintiff developed for the Google Search project was "Carmen". Director Hegarty reviewed and approved the proof-of-concept for Carmen.

**<u>Plaintiff Receives Highly Regarded Accolade in Honor of Her Success at Defendant</u>**

37. In or around June 2025, Plaintiff received the highly regarded Stella Award at the Luminary Awards. Global Strategy Director Rachel Turner (hereinafter "Director Turner") lauded Plaintiff as an "Architect of Connection", and numerous other Defendant TELUS leaders and employees showered Plaintiff with praise and positive feedback.

38. During this time, Plaintiff networked with leadership and cultivated promotion opportunities that reflected her strategic skill set. She met with senior leaders, including VP

Product Mitch Lieberman (hereinafter "VP Lieberman"), Director Turner, and Global Vice President, CXAI – Business & Delivery Erin Walker (hereinafter "VP Walker"), among others.

**Defendant TELUS Promotes Plaintiff in Recognition of**
**Her Exceptional Performance – But Offers Her the Lowest Salary on Scale**

39. In or around August 2025, Plaintiff secured an interview for a GenAI Project Manager position on a newly formed team. Plaintiff received overwhelmingly positive feedback and told that she was selected for the position, but was informed that the role had been put on hold for the moment.

40. In or around September 2025, Defendant TELUS followed up with Plaintiff and officially offered Plaintiff the Project Manager position with a base salary of $140,000 plus a performance-based bonus. Plaintiff was well aware that the salary offer was significantly lower than competitive market rates, but Defendant refused to negotiate with Plaintiff. Although disappointed, Plaintiff accepted the offer for the growth opportunities she believed it entailed.

41. Upon information and belief, Plaintiff's similarly situated male counterparts were paid more in similar roles.

**Plaintiff Begins Working in Her New Role**

42. On or around October 23, 2025, Plaintiff started her first day in her new role and immediately dived into days of meetings, training, and preparation. As Project Manager on the GenAI team, Plaintiff was a part of an approximately 70-person global team with a pool of over 100,000 contributors worldwide that managed and built Project Sonic, a major project for Meta. The project was fast-paced and demanding, and Plaintiff worked 12-hour days to familiarize herself with the projects and relevant documents and develop strategy.

43. In her new position, Plaintiff was supervised by Director of Delivery, GenAI Jessica Sargent, and she worked with Project Manager John Beck (hereinafter "Co-worker Beck"),

Project Manager, AI Data Solutions Pablo Hernandez (hereinafter "Co-worker Hernandez"), and Director, Quality GenAI Peggy Keys, among others.

44. Co-worker Beck trained Plaintiff during her first week in her new role. During the hiring process, Directors Sargent and Senior Director of GenAI Delivery Cristina Werdall (hereinafter "Senior Director Werdall") informed Plaintiff that she would operate on a 30-60-90-day ramp up that would include client training and getting Plaintiff up to speed during the first 30 days, with a complete handover of responsibilities occurring thereafter.

**Plaintiff Immediately Identifies Unpaid Wages, Data Security Issues, and Other Illegal or Unethical Activity and Makes Verbal Reports to Director Sargent and Director Keys**

45. Soon after she began working with her team in the new role, Plaintiff noticed that there were several issues with data security on the GenAI team, including mislabeled emails, flawed email distribution lists, and unchecked programs with bugs and other issues. This meant that sensitive and confidential information, tools and software were routinely being wrongly sent to thousands of contributors and non-contributors alike, including individuals who had been "banned" from certain projects.

46. Even worse, Plaintiff discovered that Defendants had widespread issues with failing to pay contributors, totaling approximately $1,000,000 in payments that were owed. Plaintiff also discovered a host of other incorrect payments to contributors, and even payments sent to the entirely wrong individuals.

47. Plaintiff found that both the above two issues – missed payments and security breaches – arose from Defendants' "roster," a master database of project contributors, containing more than 30 information fields of information per individual for items such as contact information, location, assignments, levels of permissions and authorizations, and payment

information (the "Roster"). The Roster was extremely flawed, containing software bugs and glitches, and was rife with inaccurate, outdated or flat-out missing information.

48. Plaintiff discussed these issues at length with fellow Europe-based Project Manager on the project Pablo Hernandez (hereinafter "Co-worker Hernandez").

49. When Plaintiff immediately reported the data security issues to Director Sargent and Director Keys, they instructed Plaintiff to immediately send out emergency correspondence and "P0" requests – top priority correspondence sent out only when a tremendous error or inaccuracies occur – to resolve the data security issues.

50. Plaintiff insisted to Director Sargent and Director Keys that they needed to fix the root cause: the flawed Roster database. Director Sargent and Director Keys refused to offer guidance and simply instructed Plaintiff to send out emergency P0 requests whenever there was a data security issue.

51. At times, Plaintiff had as many as five P0 "emergency" requests a day – all while she was still onboarding and learning the systems. Plaintiff worked expeditiously to resolve these security breaches as they arose. Director Sargent and Director Keys became increasingly frustrated with Plaintiff as she insisted on addressing the root cause instead of sending constant emergency correspondence after issues already arose.

52. Around this same time, in or around late October 2025, Plaintiff witnessed more than 10,000 email addresses in the Roster for the project that were misassigned to incorrect recipients, meaning more than 10,000 individuals received either incorrect payments or no payments at all.

53. Plaintiff immediately reported this issue to Director Sargent, but Director Sargent dismissed her concerns.

54. Director Sargent told Plaintiff that the information in the Roster – which contained thousands of individuals – was somehow "all in [her] head" and not to worry about the incorrect or unsent payments, because she knew what she was doing. Director Sargent tersely ended the conversation before Plaintiff could ask how she could possibly have "in her head" the contact information and payment details of thousands of contributors who deserved payment for the work they completed.

55. Plaintiff, still highly concerned about the wage issues, reported them again to Director Sargent as problems continued to arise. Director Sargent reiterated her bizarre explanation, and added that VP Pike was aware that Director Sargent was the only one who understands how the Roster system works because she has it "all in her head."

56. Meanwhile, Director Sargent clearly had not memorized the Roster containing 150,000 individuals with over 30 columns of information for each, and severe legal and ethical issues continued to arise from repeated errors.

57. Plaintiff and her colleagues were forced to constantly conduct damage control to keep the project together, as contributors demanded proper payments and constant data and security breaches occurred.

58. In fact, errors of this nature occurred consistently with Defendant's GenAI projects, resulting in constant emergency communications and rewrites without any guidance or explanation from leadership. Instead, leadership, including Director Sargent and Keys, constantly pushed employees to work faster and longer and to not question any errors, no matter how consistent.

59. Plaintiff consistently reported to Director Sargent and Director Keys the issues and glitches with the Roster as they caused repeated security breaches and payment issues, but Director Sargent and Director Keys ignored her.

60. In or around late October and November 2025, Defendant TELUS underwent a client audit orchestrated by Meta. As a result, two Meta clients abruptly resigned with no explanation.

61. Later in 2026, as Plaintiff later found out, the audit failed due to the data security issues Plaintiff repeatedly reported.

62. Plaintiff was deeply unsettled by Defendants' failure to address the data security breaches and unpaid wages. Plaintiff discussed her concerns with several colleagues, including Co-worker Hernandez, who corroborated the urgency of potential data security breaches and the unpaid wages to contributors. If left unchecked, the ethical violations and data security breaches would wreak havoc on Defendant's data integrity, reputation, and client relations.

63. During this time, Plaintiff continued to perform the full scope of her job duties, often working 60+ hours per week and on the weekends. She consistently scheduled calls with stakeholders in a variety of time zones, including European Time Zones, Pacific Standard Time, and India Standard Time, which caused her to work often outside of standard work hours.

**Plaintiff Engages in Protected Activity to Blow the Whistle on Ethical Violations, Unpaid Wages, and Data Security Breaches at Defendant TELUS**

64. In or around early November 2025, Director Sargent and Director Keys informed Plaintiff that the project was going to "hyperscale" and quickly expand, and that this would include the re-engagement of the 90,000 contributors. They further added that these contributors would be given an unpaid "qualification" assessment assignment before they could begin getting paid.

65. On or around November 7, 2025, Plaintiff shared a Quality Strategy and Change Management plan with Director Sargent, Director Keys and her team. In the plan, Plaintiff attempted to steer Defendants into compliance with the law and made it clear that the issue of unpaid wages is a risk factor in Defendant TELUS' quality assurance and may constitute a legal

risk, especially as Defendant seeks to re-engage 90,000 contributors without paying them for an initial qualification assignment.

66. Plaintiff's plan document included the following language warning Defendants: "Recommendation: paying for the assessment […] risk of not paying for the assessment […] flagging or raising unpaid labor costs through legal channels"

67. On or around November 7, 2025, Plaintiff verbally discussed her plan document with Director Sargent. Plaintiff reiterated her concerns about not paying contributors for their work.

68. Director Sargent was flippant and shrugged off Plaintiff's report entirely. Plaintiff pushed back against Director Sargent's nonchalance about critical legal and ethical risks, but Director Sargent irascibly refused to discuss the topic any further.

69. Director Sargent and Director Keys ignored Plaintiff's reports and insisted that mandatory, unpaid assessments be assigned to 90,000 contributors on the GenAI project – despite being fully aware of the legal risks of assigning unpaid work.

**Defendants Retaliate Against Plaintiff For Her Whistleblowing**

70. Shortly after Plaintiff blew the whistle, Defendants immediately began revoking the promised comprehensive training for her role.

71. Despite initially promising Plaintiff the 30-60-90 training plan, in or around early November 2025, Director Sargent abandoned the plan entirely. Director Sargent never provided Plaintiff with any clear objectives or Key Performance Indicators ("KPIs") for her new role and never followed up about any other training, leaving Plaintiff to figure everything out for herself.

72. Thus, after her report, Defendants made it clear Plaintiff was expected to be fully transitioned into her role within a mere 2-3 weeks, instead of the 3 months of training she was promised.

73. Refusing to step down from the challenge and committed to helping Defendants remain in compliance with the law, Plaintiff took the initiative to consult with similarly situated colleagues, including Co-worker Beck, to understand the full scope of her role and perform all of her duties.

74. In or around mid-November 2025, less than two weeks after Plaintiff's verbal and written reports expressing concerns about the legal risk of unpaid labor, Defendant Sargent abruptly began aggressively criticizing Plaintiff, giving her negative feedback, and questioning her performance.

75. On or around November 19, 2025, during a 1:1, Defendant Sargent abruptly accused Plaintiff of not fulfilling the expectations of her role, claiming that she was incapable of completing necessary tasks, inaccurately input data, and was not meeting the "minimum expectations" of her role. Plaintiff was shocked by Defendant Sargent's sudden accusations, as this was the first time she had heard of any such issues with her performance.

76. Plaintiff responded that Defendant Sargent's assessment of her work was unfair and that Defendant Sargent herself had assured Plaintiff she would have a 30-60-90-day ramp up to meet the expectations of the project. Defendant Sargent irascibly denied that Plaintiff had ever been put on such a plan; responded that Plaintiff was being "defensive"; and threatened to call Human Resources (hereinafter "HR"). Confused and worried about her job, Plaintiff asked Defendant Sargent why HR needed to be involved. Defendant Sargent ignored Plaintiff and threatened to schedule an HR meeting for the following Monday.

77. Plaintiff felt panicked and dismayed by Defendant Sargent's threatening accusations about her job performance and could not help but feel that the negative review was contrived in retaliation for Plaintiff's whistleblower complaint.

78. After the meeting, Defendant Sargent sent an email to Plaintiff stating that Plaintiff was not "meeting the bare minimum requirements of the job" and threatened to lower Plaintiff's compensation level. In the email, Defendant Sargent blamed Plaintiff for an array of issues with the project, including that Plaintiff had an "insufficient understanding of roster statuses and classification nuances" – a clear attempt to delegitimize Plaintiff's repeated whistleblower complaints of unpaid wages and issues with the Roster causing missed payments and data breaches.

79. Incredibly, Defendant Sargent even blamed Plaintiff for the very errors she reported on and tried to fix, such as the Roster email security breach issues that Plaintiff had already identified.

80. Plaintiff was terrified for her job security and feared that the negative feedback and escalation to HR was retaliatory pretext to justify the termination of her employment.

81. Plaintiff responded to the email, delineating the many completed tasks, responsibilities, and accomplishments she had achieved in her brief time on the project – including the damage control she had done in light of the onslaught of security breach and wage issues. Plaintiff addressed each area of concern Defendant Sargent identified and outlined detailed strategies for resolving any and all issues. Plaintiff implored Defendant Sargent that she was committed to her role and would take concrete actions to respond to her feedback.

82. In her response to Plaintiff's good-faith email, Defendant Sargent condescendingly wrote: "I need to be very direct with you: I don't believe you're fully grasping the severity of this

situation." Defendant Sargent dismissed Plaintiff entirely, aggressively delineating every way in which Plaintiff was incorrect in her email. Incredibly, Defendant Sargent even accused Plaintiff of failing to "proactively [mitigate] risks before they escalate" – only days after Plaintiff made a clear and concise report of the legal risks of unpaid wages and data security concerns. Although Plaintiff worked on a team of three Project Managers, she was being singled out and blamed for all of the issues with the project. It was clear to Plaintiff that Defendant Sargent had no intention of fairly assessing her performance.

83. Defendant Sargent continued, stating that "The compliance risks are real and urgent" and threatening that "Leadership is watching this closely, and… additional actions would be considered" if Plaintiff did not immediately improve.

84. Plaintiff was shocked by Defendant Sargent's overt attempt to place the blame on Plaintiff for the numerous compliance risks in the GenAI project – the very risks Plaintiff herself had reported to her.

85. It became clear that Defendant Sargent had decided that Plaintiff's punishment for blowing the whistle would be making Plaintiff the scapegoat for the host of legal and ethical issues that Plaintiff was trying to rectify.

86. Defendant Sargent ordered Plaintiff to reply with a "solutions plan" by Monday, November 24, 2025.

87. Plaintiff felt trapped given she had already consistently offered Defendant Sargent solutions by proposing changes to the Roster and paying contributors for the unpaid assessments.

**<u>Plaintiff Engages in Protected Activity to Report Targeted Mistreatment to VP Pike</u>**

88. On or around November 20, 2025, Plaintiff scheduled a meeting with VP Pike to discuss the expectations of her role and performance. During the meeting, Plaintiff disclosed her

concerns that she was being unfairly targeted and blamed for legal and ethical issues in the GenAI project that she herself had reported and been working hard to fix.

89. VP Pike recognized these issues but jokingly responded that working on the GenAI project was like "building a plane while you are flying it and it is simultaneously crashing."

90. It thus became clear that leadership, while well aware of the legal and ethical issues, had no intention to fix things and instead had accepted that the project would fail.

91. It also became even more clear to Plaintiff that Director Sargent was setting her up as a scapegoat given the project was ending, and she had no intention to actually fix the issues that had arose.

92. At this same meeting, Plaintiff reported to VP Pike that she had concerns about being able to do her job, and that Director Sargent was not allowing her to substantively address the legal and ethical issues she had reported. VP Pike acknowledged Plaintiff's report, but instead of discussing any concrete steps to change things, she ominously acknowledged that Plaintiff "can't do [her] job without psychological safety." While confused by this comment, Plaintiff nonetheless understood that VP Pike had acknowledged the severe hostility she was enduring from Director Sargent.

93. VP Pike told Plaintiff she would meet with Director Sargent and with Plaintiff in regular touch points, but made no concrete assurances.

**<u>Plaintiff Suffers Severe Mental Health Issues Due to Defendants' Retaliation</u>**

94. In or around November 2025, Plaintiff began to suffer severe mental health symptoms, including, but not limited to anxiety, depression, insomnia, and emotional exhaustion.

95. While Plaintiff had long been able to successfully manage her Bipolar and PTSD diagnoses, Defendants' intense retaliation and hostility triggered her underlying symptoms, causing the flareup of mental health symptoms to be even worse.

96. Indeed, even with Plaintiff's November 20 report to VP Pike of her whistleblowing and the severe, retaliatory hostility, and VP Pike's promise to meet with Director Sargent, nothing changed. Director Sargent continued unjustly criticizing Plaintiff, blaming her for the very issues Plaintiff was imploring her for permission to address, all as Plaintiff scrambled to conduct damage control as constant security breaches and complaints regarding improper payments continued to arise.

97. Plaintiff reached out to the employee assistance program and spoke with a counselor. Plaintiff discussed the mental health symptoms that had arisen as a result of Defendants' retaliation. During the meeting, Plaintiff discussed that she felt unsafe in her role.

98. Upon information and belief, having been notified of her mental health disability, Defendants became even more intent on eliminating Plaintiff from her role.

**<u>Defendants Continually Target Plaintiff for Her Whistleblower Complaint, Her Report of Targeted Mistreatment, and Her Disclosed Mental Health Symptoms</u>**

99. After Plaintiff disclosed her mental health symptoms, the hostile work environment escalated.

100. Upon information and belief, Defendants understood Plaintiff to have mental health disabilities and decided to make her even more of a target.

101. On or around November 23, 2025, Defendant Sargent publicly admonished Plaintiff in the project team group chat, accusing Plaintiff of not completing a task and threatening to showcase proof of how Plaintiff had failed in her responsibilities and was not working enough.

102. Plaintiff, who regularly worked over 60 hours a week, juggling meetings across several time zones in addition to working weekends, was humiliated by Defendant Sargent's false public accusations against her. Plaintiff responded to the chat by linking the deliverable document in question and encouraged Defendant Sargent to produce the so-called proof that she did not complete the document or that she had not been working. In response, Defendant Sargent sent Plaintiff a direct message in which she commanded Plaintiff to stop posting in the group chat and scheduled a meeting with HR and Plaintiff.

103. This latest attack triggered even more severe anxiety in Plaintiff.

**Plaintiff Requires Medical Leave of Absence to Mitigate Escalating Mental Health Symptoms**

104. On or around November 24, 2025, Plaintiff experienced a panic attack due to the ongoing retaliation she suffered at Defendant TELUS. She immediately requested a medical leave of absence from Defendant's HR due to her mental health state. In her request, Plaintiff once again reported that she felt unsafe at work due to the retaliatory mistreatment Defendant Sargent subjected her to.

105. On or around November 24, 2025, Plaintiff attended a meeting with her doctor to mitigate her panic attack and continuing mental health symptoms.

**Defendant TELUS' Legal and Ethical Violations with Project GenAI Continue to Escalate**

106. On or around November 25, 2025, while on medical leave, Plaintiff continued receiving messages via the project team group chat. Through the messages, it was evident that many of the issues with the project, including data inaccuracies and unpaid wages, were continually unaddressed and apparently escalating in urgency. The group chat demonstrated general confusion among the staff and a failure to produce any solutions to address the gargantuan legal and ethical issues proliferating in the project.

107. At one point, Defendant Sargent recognized the issue with the more than 10,000 names on the roster list with incorrect emails that Plaintiff had already identified and reported as an egregious data security risk weeks earlier.

**Plaintiff Applies for FMLA to Mitigate**
**Work-Related Mental Health Issues and Family Emergency**

108. During this time, Plaintiff's mental health continued to suffer as she feared that Defendants would continue to blame her for the numerous issues with the GenAI project to establish pretext for the termination of her employment in retaliation for her whistleblower complaint.

109. In or around the beginning of December 2025, Plaintiff experienced a family emergency. Plaintiff became required to take care of her mother while her mother applied for long term care.

110. On or around December 3, 2025, Plaintiff disclosed the emergency and her mental health status to HR, notifying Defendant TELUS that she intended to apply for FMLA and Washington State Paid Family and Medical Leave (hereinafter "PFML") to address her ongoing family crisis.

**Plaintiff Endures Numerous Issues and Obstacles with Her FMLA and PFML Applications**

111. Throughout December 2025, Plaintiff continually attempted to apply for FMLA and PFML. However, her applications were continually delayed without explanation. At one point, Defendant TELUS removed her PFML designations in Workday entirely without alerting Plaintiff. Plaintiff realized the issue and alerted HR, and her designations were reinstated.

112. Plaintiff continued to use Paid Time Off as sick leave to cover her time off while her FMLA and PFML applications were pending.

**Defendant TELUS Continues to Subject Plaintiff to**
**Retaliation for Taking FMLA Leave, Ices Her Out, and Denies Her Pay**

113. On or around December 1, 2025, Plaintiff sent a letter notifying Defendants she had retained counsel. That same day, CEO Jason Macdonnell and Chief Legal Office Michel E. Belec abruptly resigned from their positions.

114. On or around December 9, 2025, Defendant TELUS sent a company-wide notice stressing that employees preserve documentation in projects. Plaintiff realized that Defendants had removed her from at least one group work chat for the GenAI project. To Plaintiff's knowledge, the work chat in question included several incriminating messages that could further jeopardize the legality and security of the GenAI project – including discussions openly acknowledging the roster of incorrect emails and distribution of unpaid assessments.

115. On or around January 8, 2026, Plaintiff received approval for FMLA for 12 weeks of unpaid leave and PFML for 12 weeks of paid leave, totaling 24 weeks.

116. In or around the beginning of January 2026, despite Plaintiff using PTO during the month of December to cover her days off, she did not receive a paycheck. She immediately alerted HR to the issue.

117. Throughout January 2026, Defendant TELUS restricted Plaintiff's access to her company login, email, and several group chats involving the GenAI project. Plaintiff was still employed and shocked that she was being blatantly blocked from her work accounts.

118. On or around January 19, 2026, Plaintiff reached out to Defendant TELUS' HR to request reinstatement of her access to accounts. HR informed her that she should not have been revoked, and assured her that access would be restored promptly. However, Plaintiff was continually barred from her work laptop for several days thereafter when Sargent then granted access; the delay in Sargent granting access to Plaintiff's work laptop was because she was out of

the office, but she was on site at a client event. Plaintiff reached out to Defendant's IT department to request full restored access, per HR's assurance, but IT informed her that only Defendant Sargent could restore her access to the group chats.

119. To this day, Defendant TELUS continues displaying Plaintiff's leave on its employee portal without the proper designations and allocations, which has caused Plaintiff additional stress and anxiety that Defendant TELUS was not properly recognizing her leave.

120. In or around February 2026, Plaintiff's mother's long term care got approved on a partial basis.

**Plaintiff Continues to Suffer Irrevocable Damage to Her Mental Health**
**Due to the Ongoing Retaliatory Hostile Work Environment at Defendant TELUS**

121. During this time, Plaintiff continued to experience escalating symptoms of anxiety and dread that inhibited her ability to perform normal, daily functions in her personal life and mitigate the damages of her work-related mental health issues.

122. While Plaintiff had managed to handle the difficulties of her prior mental health diagnoses and her mother's care needs without major incident, Defendants' cruel retaliation pushed her to a breaking point, causing severe symptoms such as anxiety and depression.

123. Defendants' actions triggered Plaintiff's underlying mental health conditions, which had previously been well-controlled. Plaintiff's mental health continued to deteriorate through 2026 as a result.

124. In or around April 2026, Plaintiff began experiencing even more severe anxiety at the prospect of having to return to work soon in May when her leave ran out, and face even more hostility from Director Sargent, who clearly had it out for her.

125. On or around April 18, 2026, Plaintiff was hospitalized due to severe mental health symptoms linked to her Bipolar diagnosis, which had been severely aggravated by Defendants' retaliation.

126. Plaintiff remained haunted by the prospect of returning to work and facing Director Sargent's hostility, being blocked from correcting the onslaught of legal and ethical issues, all while being attacked and reprimanded for the very issues she implored Defendants to address.

127. Plaintiff has been put on new medications and attended routine psychiatric sessions to manage the severe mental health symptoms caused by Defendants' retaliation.

128. On or around May 12, 2026, Plaintiff was forced again to seek emergency treatment for her mental health symptoms.

129. On or around May 14, 2026, Plaintiff notified Defendants of her hospitalization and requested short-term disability leave.

130. To this day, Plaintiff remains on leave.

**AS AND FOR PLAINTIFF'S FIRST CAUSE OF ACTION**
***Whistleblower Retaliation in Violation of New York Labor Law § 740***

131. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

132. At all relevant times, Plaintiff was an "employee" and Defendants were "employers" within the meaning of New York Labor Law § 740(1).

133. Plaintiff engaged in protected activity within the meaning of New York Labor Law § 740(2)(a) when, on or around November 7, 2025, she disclosed verbally and in writing to her supervisors — Director Sargent, Director Keys, and VP Pike — her reasonable belief that Defendants were engaged in activities, policies, and practices constituting violations of law, rule, and regulation, and posing a substantial and specific danger to the public health and safety,

including: (i) the systematic distribution of unpaid assessments to approximately 90,000 contracted workers on the GenAI project in violation of applicable wage and labor laws; and (ii) critical data security breaches, including the maintenance and distribution of a roster containing more than 10,000 names associated with incorrect email addresses, exposing a substantial number of individuals to unauthorized data disclosure and privacy violations.

134. Defendants were aware of Plaintiff's protected disclosures, which were made directly to supervisory personnel with the authority to direct and control Plaintiff's work performance and to take corrective action regarding the violations she reported.

135. Rather than address the violations Plaintiff reported, Defendants subjected Plaintiff to immediate and sustained retaliatory action within the meaning of New York Labor Law § 740(1)(e), including, but not limited to: fabricating performance deficiencies and issuing unwarranted negative performance reviews; threatening Plaintiff's compensation; threatening and initiating HR escalation as pretext for termination; publicly humiliating Plaintiff in a company group chat; restricting Plaintiff's access to her company login, email, and work group chats during her approved medical leave; and removing Plaintiff from at least one group chat containing communications directly relevant to the violations she had reported.

136. There is a direct and proximate causal nexus between Plaintiff's protected disclosures and Defendants' retaliatory conduct, which commenced immediately following Plaintiff's November 7, 2025 reports and escalated continuously thereafter. Notably, Defendant Sargent — the very supervisor to whom Plaintiff reported the violations — accused Plaintiff of failing to "proactively mitigate risks before they escalate" only days after Plaintiff had done precisely that, and blamed Plaintiff for roster errors that Plaintiff had already identified and reported as a data security risk.

137. As a direct and proximate result of Defendants' unlawful retaliatory conduct, Plaintiff has suffered and continues to suffer lost wages, lost benefits, severe mental and emotional distress, anxiety, reputational harm, and harm to her professional career, in amounts to be determined at trial, together with all relief available under New York Labor Law § 740(5), including reinstatement, back pay, attorneys' fees, and costs.

## AS AND FOR PLAINTIFF'S SECOND CAUSE OF ACTION

***Interference with and Retaliation for Exercise of FMLA Rights — 29 U.S.C. § 2615***

138. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein

139. At all relevant times, Defendant TELUS was a covered employer and Plaintiff was an eligible employee entitled to leave under the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq.

140. Plaintiff exercised her rights under the FMLA and Washington State PFML when, on or around December 3, 2025, she notified Defendant TELUS of her intent to apply for FMLA and Washington State PFML leave due to her work-related mental health condition and family emergency, and when her FMLA was subsequently approved for twelve (12) weeks of leave commencing on or around January 8, 2026.

141. Defendants interfered with Plaintiff's exercise of her FMLA rights by: repeatedly delaying the processing of Plaintiff's FMLA and Washington State PFML applications without explanation; removing Plaintiff's PFML application without notice; converting Plaintiff's intermittent FMLA and Washington State PFML to block or continuous FMLA and Washington State PFML, failing to timely and accurately compensate Plaintiff during her leave; and generating erroneous overpayments that directly jeopardized Plaintiff's PFML eligibility — burdens to which, to Plaintiff's knowledge, no similarly situated colleague was subjected.

142. Defendants further retaliated against Plaintiff for exercising her FMLA rights by restricting her access to her company login, email, and work group chats throughout January 2026 while Plaintiff remained an active employee on approved leave, and by directing that only Defendant Sargent — the primary instrument of Defendants' retaliatory campaign — could restore Plaintiff's access to company communications.

143. There is a direct and proximate causal nexus between Plaintiff's exercise of her FMLA rights and Defendants' interference and retaliatory conduct.

144. As a direct and proximate result of Defendants' unlawful interference and retaliation, Plaintiff has suffered and continues to suffer lost compensation, lost benefits, severe emotional distress, and other economic and non-economic harm, in amounts to be determined at trial, together with liquidated damages, attorneys' fees, and costs as provided by law.

## AS AND FOR PLAINTIFF'S THIRD CAUSE OF ACTION
### *Disability Discrimination and Failure to Accommodate in Violation of the New York State Human Rights Law and the New York City Human Rights Law*

145. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

146. At all relevant times, Plaintiff was a qualified individual with a disability within the meaning of the Americans with Disabilities Act, the New York State Human Rights Law, and the New York City Human Rights Law. As a direct result of Defendants' retaliatory and hostile conduct, Plaintiff developed serious mental health conditions, including severe anxiety and panic attacks, that substantially limited one or more major life activities, including but not limited to working, sleeping, and performing normal daily functions.

147. Defendants were aware of Plaintiff's disability. On or around November 24, 2025, Plaintiff experienced a panic attack and immediately requested a medical leave of absence from

Defendants' HR, disclosing her work-related mental health condition and the mistreatment that caused it. Plaintiff further disclosed her condition to VP Pike, to her treating physician, and in subsequent communications with Defendants' HR throughout December 2025 and January 2026.

148. Defendants discriminated against Plaintiff on the basis of her disability by, among other things: failing to engage in any good-faith interactive process to identify a reasonable accommodation; restricting Plaintiff's access to her work accounts and communications during her approved leave; failing to timely and properly process Plaintiff's leave applications; generating erroneous payments that threatened Plaintiff's medical leave eligibility; and subjecting Plaintiff to adverse employment treatment and heightened scrutiny not applied to non-disabled employees.

149. Defendants failed to provide Plaintiff with a reasonable accommodation for her disability despite having ample notice of her condition and its cause, and despite the availability of reasonable accommodations that would not have posed an undue hardship to Defendants.

150. As a direct and proximate result of Defendants' unlawful disability discrimination and failure to accommodate, Plaintiff has suffered and continues to suffer lost wages, lost benefits, severe emotional distress, reputational harm, and harm to her professional career, in amounts to be determined at trial, together with punitive damages, attorneys' fees, and costs as provided by law

## AS AND FOR PLAINTIFF'S FOURTH CAUSE OF ACTION

***Hostile Work Environment in Violation of the New York State Human Rights Law and the New York City Human Rights Law***

151. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

152. Defendants subjected Plaintiff to a severe and pervasive hostile work environment based on her disability and in retaliation for her protected activities, in violation of the New York State Human Rights Law and the New York City Human Rights Law.

153. Defendants' hostile conduct included, but was not limited to: Defendant Sargent's sustained campaign of aggressive and unwarranted performance criticism commencing immediately after Plaintiff's protected disclosures; threats of HR escalation and termination as retaliatory pretext; the public humiliation of Plaintiff in a company group chat; written accusations that Plaintiff was not "meeting the bare minimum requirements of the job"; demands for a "solutions plan" as pretextual grounds for termination; and the deliberate isolation of Plaintiff from work communications during her approved medical leave.

154. Defendants' conduct was sufficiently severe and pervasive to alter the terms and conditions of Plaintiff's employment and to create a work environment that a reasonable person would find hostile and abusive. Indeed, Plaintiff reported to VP Pike that she did not feel safe at her job due to the mistreatment she was subjected to, and VP Pike herself acknowledged that Plaintiff "need(s) psychological safety in order to do (her) job."

155. Defendants knew or should have known of the hostile work environment — it was perpetrated by a direct supervisor and expressly reported to VP-level management — and failed to take prompt or effective remedial action.

156. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer severe emotional distress, anxiety, reputational harm, and harm to her professional career and earning capacity, in amounts to be determined at trial, together with punitive damages, attorneys' fees, and costs as provided by law.

**AS AND FOR PLAINTIFF'S FIFTH CAUSE OF ACTION**
***Unequal Pay in Violation of New York Labor Law § 194***

157. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

158. Plaintiff performed work substantially equal to that of her male comparators in terms of skill, effort, and responsibility, and under similar working conditions, yet was compensated at a rate significantly below competitive market rates for the Project Manager role she performed.

159. In or around September 2025, Defendants offered Plaintiff the Project Manager position at a base salary of $140,000 and refused to negotiate, despite Plaintiff's qualifications and the considerable demands of the role — which required her to work in excess of 60 hours per week, coordinate with stakeholders across multiple international time zones, and oversee compliance, data security, and quality strategy for a project involving approximately 90,000 contracted workers worldwide.

160. Defendants' failure to compensate Plaintiff in line with her male comparators constitutes unlawful pay discrimination in violation of New York Labor Law § 194 and applicable federal equal pay law.

161. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer lost wages and compensation in amounts to be determined at trial, together with liquidated damages, attorneys' fees, and costs as provided by law.

## AS AND FOR PLAINTIFF'S SIXTH CAUSE OF ACTION

***Retaliation for Reporting Wage Violations in Violation of the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3)***

162. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

163. At all relevant times, Defendant TELUS was a covered employer and Plaintiff was an employee within the meaning of the Fair Labor Standards Act, 29 U.S.C. § 201 et seq.

164. Plaintiff engaged in protected activity within the meaning of 29 U.S.C. § 215(a)(3) when, on or around November 7, 2025, she reported verbally to Director Sargent and in writing to Director Sargent, Director Keys, and VP Pike her concerns regarding the systematic distribution of unpaid assessments to approximately 90,000 contracted workers on the GenAI project. In doing so, Plaintiff explicitly identified the legal risk of unpaid wages — conduct that a reasonable employer would have understood as an assertion of rights protected under the FLSA.

165. Defendants were aware of Plaintiff's protected activity. Plaintiff's report was made directly and explicitly to supervisory personnel with authority to direct and control her work and to take corrective action regarding the violations she identified.

166. Following Plaintiff's protected activity, Defendants subjected Plaintiff to adverse employment actions, including, but not limited to: cutting short her training; fabricating performance deficiencies and issuing unwarranted negative performance reviews outside of the scope of the normal review process; threatening Plaintiff's compensation; threatening and initiating HR escalation as pretextual grounds for termination; publicly humiliating Plaintiff in a company group chat; restricting Plaintiff's access to her company login, email, and work group chats; and removing Plaintiff from at least one group chat containing communications directly relevant to the wage violations she had reported.

167. There is a direct and proximate causal connection between Plaintiff's protected activity and Defendants' adverse employment actions. The retaliatory conduct commenced immediately following Plaintiff's November 7, 2025 written report and contemporaneous verbal reports and escalated continuously thereafter, including Defendant Sargent's accusation that Plaintiff failed to "proactively mitigate risks before they escalate" — made only days after Plaintiff had done precisely that by reporting the unpaid wage violations to her supervisors.

168. As a direct and proximate result of Defendants' unlawful retaliation, Plaintiff has suffered and continues to suffer lost wages, lost benefits, severe emotional distress, reputational harm, and harm to her professional career, in amounts to be determined at trial, together with liquidated damages, attorneys' fees, and costs as provided by 29 U.S.C. § 216(b).

**AS AND FOR PLAINTIFF'S SEVENTH CAUSE OF ACTION**
***Retaliation for Reporting Wage Violations in Violation of New York Labor Law § 215***

169. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

170. At all relevant times, Defendant TELUS was an employer and Plaintiff was an employee within the meaning of the New York Labor Law.

171. Plaintiff engaged in protected activity within the meaning of New York Labor Law § 215 when, on or around November 7, 2025, she reported verbally to Director Sargent and in writing to Director Sargent, Director Keys, and VP Pike her concerns regarding the systematic distribution of unpaid assessments to approximately 90,000 contracted workers on the GenAI project in violation of applicable wage and labor laws. Plaintiff reported these concerns in writing through a Change Management communications strategy and Quality Strategy plan, in which she made clear that the issue of unpaid wages constituted a legal risk to Defendants. In or around early November 2025, Plaintiff also verbally reported issues with the Roster which caused repeated missed or improper payments and data security breaches.

172. Defendants were aware of Plaintiff's protected activity, which was made directly to supervisory personnel with authority to direct and control Plaintiff's work performance and to take corrective action regarding the violations she reported.

173. Following Plaintiff's protected activity, Defendants subjected Plaintiff to a sustained pattern of retaliatory adverse employment actions, including, but not limited to: cutting short her promised three months of training after two weeks; fabricating performance deficiencies and issuing unwarranted negative performance reviews; threatening Plaintiff's compensation; threatening and initiating HR escalation as pretextual grounds for termination; publicly humiliating Plaintiff in a company group chat; restricting Plaintiff's access to her company login, email, and work group chats during her approved medical and family leave; and removing Plaintiff from at least one group chat containing communications directly relevant to the wage violations she had reported.

174. There is a direct and proximate causal connection between Plaintiff's protected activity and Defendants' retaliatory conduct. The retaliation commenced immediately following Plaintiff's November 7, 2025 report and continued and escalated throughout the duration of Plaintiff's employment and leave. The pattern of retaliatory conduct, its immediacy, and its clear targeting of the substance of Plaintiff's wage-related disclosures establish the requisite causal nexus.

175. As a direct and proximate result of Defendants' unlawful retaliation in violation of New York Labor Law § 215, Plaintiff has suffered and continues to suffer lost wages, lost benefits, severe emotional distress, reputational harm, and harm to her professional career, in amounts to be determined at trial, together with liquidated damages, attorneys' fees, and costs as provided by law.

## RELIEF DEMANDED

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

a. A declaratory judgment that the actions, conduct, and practices of Defendants complained of herein violate the laws of the United States and the State of New York;

b. An injunction and order permanently restraining Defendants and their partners, officers, owners, agents, successors, employees, and/or representatives, and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

c. An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus pre- and post-judgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, loss of past and future income, wages, compensation, seniority, and other benefits of employment;

d. An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus pre- and post-judgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her emotional distress, anxiety, and mental anguish;

e. An award of liquidated damages as provided under the Family and Medical Leave Act, the Fair Labor Standards Act, and the New York Labor Law, in an amount to be determined at trial;

f. An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff, including, but not limited to, loss of income, earned bonus pay, reputational harm, and harm to professional reputation, in an amount to be determined at trial;

g. An award of punitive damages and any applicable penalties, in an amount to be determined at trial;

h. Pre- and post-judgment interest on all amounts due;

i. An award of costs that Plaintiff has incurred in this action, including, but not limited to, expert witness fees, as well as Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and

j. Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands trial on all issues triable by a jury.

Dated: New York, New York
September 17, 2026

Respectfully submitted,
GODDARD LAW PLLC
*Attorneys for Plaintiff*

By: /s/ Megan S. Goddard
Megan S. Goddard, Esq.
39 Broadway, Suite 1540
New York, NY 10006
Office: 646-504-8363
Fax: 212-473-8705
Megan@goddardlawnyc.com